# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00163-COA

ALI M. ALMASRI                                                                APPELLANT

v.

CINDY HYDE-SMITH, COMMISSIONER OF                                    APPELLEES
THE MISSISSIPPI DEPARTMENT OF
AGRICULTURE AND COMMERCE AND DR.
ASHLI BROWN, STATE CHEMIST

| | |
|---|---|
| DATE OF JUDGMENT: | 11/23/2016 |
| TRIAL JUDGE: | HON. JOHN ANDREW HATCHER |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM C. STENNETT |
| ATTORNEY FOR APPELLEES: | ROBERT W. GRAVES |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | APPEAL DISMISSED - 06/12/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE LEE, C.J., GREENLEE AND TINDELL, JJ.

### GREENLEE, J., FOR THE COURT:

¶1. Ali Almasri operates a gas station, Bull Market #23, where he sells ethanol-blended gasoline and conventional (non-ethanol) gasoline. After a state petroleum inspector performed a routine test on Almasri's ethanol-blended tank, the tank tested positive for water. The inspector then sent samples from the tank to the state chemical laboratory, where further testing and analysis confirmed the ethanol-blended gasoline Almasri was selling contained water, in violation of Mississippi Code Annotated section 75-55-11 (Rev. 2016).[1]

---

[1] Section 75-55-11 provides that "[n]o person shall sell gasoline which fails to meet the standard" defined by Chapter 55. Under section 75-55-3(3), the Commissioner of

Thereafter, the Mississippi Department of Agriculture and Commerce (MDAC) sought a permanent injunction prohibiting Almasri from selling or distributing ethanol-blended gasoline at his station. During an evidentiary hearing, Almasri challenged the State's testing methods, and both he and the State presented expert testimony concerning proof of the water found in the tank. Finding the State's expert to be more credible, the chancellor entered a judgment on November 23, 2016, finding the State used the proper testing method to determine that the ethanol-blended gasoline at Almasri's station contained water. Further, the chancellor issued a permanent injunction prohibiting Almasri from selling or dispensing ethanol-blended gasoline at Bull Market #23, finding that immediate and irreparable injury, loss, or damage would be inflicted on those who bought or received the product. Fifty-five days after the chancellor entered the judgment, Almasri filed a motion to extend the time in which to file a notice of appeal, which the chancellor granted.

¶2. Finding Almasri failed to show excusable neglect as to why he did not timely file a notice of appeal, we dismiss for want of jurisdiction.

## BACKGROUND

¶3. Ali Almasri operates the Bull Market #23, a gasoline station in Guntown, Mississippi. The Bull Market station has four nozzles that dispense ethanol-blended gasoline and four that dispense conventional (non-ethanol) gasoline. The station has two underground tanks: one

Agriculture and Commerce "and the State Chemist shall have joint authority for setting specifications of petroleum products and shall have the authority to establish rules and regulations in connection with enforcement of . . . [Chapter 55]." The state regulation regarding water tolerance requires that no phase separation may occur. Miss. Admin. Code § 2-1-4:08

containing ethanol-blended gasoline, and another containing conventional gasoline. One line from the ethanol tank services the four ethanol pumps, and another line from the conventional tank services the four conventional pumps.

¶4. On March 7, 2016, Toby Hill, a state petroleum inspector, performed a routine inspection[2] of the ethanol-blended tank at Bull Market #23. The gasoline in the tank tested positive for water. The inspector then pulled a sample for further testing and analysis, and sent it to the state chemical laboratory at Mississippi State University. Lab tests confirmed that the sample contained water.

¶5. On March 9, 2016, Hill issued a stop sale notice and "red tagged" the four ethanol-blended nozzles at Almasri's station by placing plastic restraints on them. However, the plastic restraints were cut off, and customers began obtaining gasoline from the pumps.[3] Following removal of the restraints, the MDAC received approximately five or six complaints from customers who experienced engine stall-outs after purchasing ethanol-blended gasoline from Almasri's station. When Hill confronted one of Almasri's store clerks with the complaints, the clerk said that Almasri told her that "everything was fine" and so the station began selling ethanol-blended gasoline again. On May 30, 2016, Hill

---

[2] The MDAC is charged with checking gas stations periodically for signage, pump calibration, ethanol content, and water content. When a petroleum inspector conducts a routine inspection of an ethanol-blended tank for water, he puts a paste on the bottom of a wooden stick and inserts it in the underground tank. If there is one-quarter inch or more of water on the stick, the pump is immediately put under a stop sale notice. This is referred to as a "stick test."

[3] It was uncontested that the plastic restraints were removed. Almasri asserted that customers cut them off.

issued another stop sale notice and replaced the restraints on the ethanol-blended nozzles.

¶6. As a result of Almasri's violation of the stop sale notices, the MDAC commissioner and the state chemist sought an injunction to enjoin Almasri from selling ethanol-blended gasoline. On June 13, 2016, the chancellor issued a temporary restraining order, in which the petroleum inspector was ordered to pull and submit samples from each ethanol-blended pump to the state chemical lab for analysis. The order further prohibited Almasri from selling or giving away any ethanol-blended gasoline, and required that the ethanol-blended pumps remain locked down. On June 28, 2016, the chancellor converted the temporary restraining order into a preliminary injunction.

¶7. On July 28, 2016, in anticipation of a hearing on the State's request for a permanent injunction, Hill pulled gasoline samples from each of the four ethanol-blended pumps at Almasri's station and delivered the samples to the state chemical lab for testing. The lab determined that all four samples tested positive for water.

¶8. On August 10, 2016, the chancellor heard arguments on the State's request for a permanent injunction. Dr. Darrell Sparks, the director of the petroleum products division of the state chemical lab at Mississippi State University, testified for the State. Dr. Sparks testified that the presence of water can damage an internal combustion engine, and that in order to determine whether a sample of gasoline contains too much water, the state chemical lab uses the "phase separation" standard. Dr. Sparks stated that phase separation is the testing method required by the American Society for Testing Materials ("ASTM") D4814, which Mississippi has adopted as a state regulation. He explained that the phase separation standard

4

does not limit water presence to a particular percentage; rather, it requires that no visual separation of water and gasoline exists to the naked eye. Dr. Sparks further testified that photographs of the four samples pulled from Bull Market on July 28, 2016, revealed visually apparent phase separation, which indicated that the samples tested positive for water.

¶9.     Dr. Donald Heck, Director of the Iowa Central Fuel Testing Laboratory, testified for Almasri by deposition. Dr. Heck explained that his laboratory uses ASTM methods and conducts several fuel-related activities, including moisture tests of ethanol-blended gasoline. Dr. Heck further testified that Almasri sent him a sample of ethanol-blended gasoline for the purpose of moisture testing. Dr. Heck said he tested the sample using ASTM E203, the volumetric Carl Fisher Moisture Test. Dr. Heck stated that he conducted two rounds of testing. He explained that the first round of tests indicated that Almasri's sample had a .141% moisture content, which is an acceptable amount of moisture for an E10[4] blend of gasoline. Dr. Heck stated that he conducted a second round of tests after the State expressed a concern that Almasri's sample may consist of gasoline taken from the top of gasoline with phase separation and would therefore not contain the same amount of moisture as the samples sent to the state chemical laboratory. Dr. Heck stated that the second round of tests did not indicate phase separation in the sample. However, Dr. Heck admitted that a moisture content of .141% would equate to a phase separation of roughly 10%, which would be visible to the naked eye. He also admitted that Mississippi follows ASTM D4814, which states that visual inspection is the method required for detecting water in gasoline.

---

[4] An E10 blend of gasoline contains 90% gasoline and 10% ethanol.

¶10.   Dr. Sparks testified by deposition in rebuttal for the State. Dr. Sparks stated that Dr. Heck's testing method for moisture content differed from that of phase separation. Dr. Sparks explained that moisture content refers to the amount of water present in a gasoline sample, whereas phase separation occurs when the amount of water in the gasoline phase exceeds the saturation point and the water starts to form its own phase. Dr. Sparks stated that Dr. Heck's method was inconsistent with the method required by Mississippi law. In addition, he said that the sample Almasri submitted to Dr. Heck was adulterated because it was taken from a portion of a larger sample from Almasri's underground tank. Dr. Sparks stated that Dr. Heck's finding of a 10% phase separation would fail by Mississippi standards.

¶11.   On November 23, 2016, the chancellor entered a judgment finding the State's use of phase separation to be the proper method of testing. The chancellor found that the gasoline samples from Bull Market #23 contained water, and he issued a permanent injunction prohibiting Almasri from selling ethanol-blended gasoline at his station.

¶12.   On January 17, 2017, Almasri filed a motion to extend the time in which to file a notice of appeal. His motion stated that he was unable to timely file notice because he could not complete a personal analysis of his business within the thirty-day filing period. Almasri further argued that he acted in good faith and therefore the chancellor should grant his requested extension. On February 2, 2017, the chancellor granted Almasri's request extending his filing deadline until February 6, 2017. Almasri filed his notice of appeal on January 30, 2017. The State argues that Almasri did not demonstrate excusable neglect to receive an extension, his notice was therefore untimely, and this appeal should be dismissed

6

for lack of jurisdiction.

## DISCUSSION

¶13.    Our appellate procedural rules require that a notice of appeal must be filed "within 30 days after the date of entry of the judgment or order appealed from." M.R.A.P. 4(a). Should a party need additional time to file a notice of appeal, the trial court may grant an extension under Rule 4(g), which provides:

> The trial court may extend the time for filing a notice of appeal upon motion filed not later than 30 days after the expiration of the time otherwise prescribed by this rule. Any such motion which is filed before expiration of the prescribed time may be granted for good cause and may be ex parte unless the court otherwise requires. Notice of any such motion which is filed after expiration of the prescribed time shall be given to other parties, and the motion *shall be granted only upon a showing of excusable neglect.*

(Emphasis added).

¶14.    In the instant case, the chancery court entered the judgment appealed from on November 23, 2016. The thirty-day appeal period therefore ended on December 23, 2016. Almasri filed his motion to file an out-of-time appeal on January 17, 2017, fifty-five days after the judgment was entered. Therefore, in order to receive additional time to file his notice of appeal, Almasri had the burden of showing that his failure to file a timely notice was a result of "excusable neglect." *Id.*; *Schmitt v. Capers (In re Estate of Ware)*, 573 So. 2d 773, 775 (Miss. 1990).

¶15.    We review a trial court's excusable-neglect determination with a bifurcated standard. *Nunnery v. Nunnery*, 195 So. 3d 747, 751 (¶12) (Miss. 2016). To the extent that the trial court's excusable-neglect determination involves the determination of legal principles, we

will conduct a de novo review. *Long v. Mem'l Hosp. at Gulfport*, 969 So. 2d 35, 38 (¶5) (Miss. 2007). "[W]hen . . . the trial judge's decision rests upon an examination of facts, we review for abuse of discretion and to ensure the decision is supported by substantial evidence." *Nunnery*, 195 So. 3d at 751 (¶12). "Which standard to apply is a decision to be made on an ad hoc basis." *Id.* (citing *Bennett v. McCaffrey*, 937 So. 2d 11, 14 (¶8) (Miss. 2006)).

¶16.    "An excusable-neglect determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 752 (¶15) (internal quotation mark omitted). The Mississippi Supreme Court has adopted the following four-part test for excusable-neglect: "(1) the danger of prejudice to the non-movant, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." *Id.* (internal quotation marks omitted) (quoting *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993)).

¶17.    "[E]xcusable neglect is a very strict standard." *Webster v. Webster*, 834 So. 2d 26, 29 (¶11) (Miss. 2002) (internal quotation mark omitted). "[S]imple inadvertence or mistake of counsel or ignorance of the rules usually does not" constitute excusable neglect. *Stutts v. Miller*, 37 So. 3d 1, 4 (¶9) (Miss. 2010); *Holmes v. Coast Transit Auth.*, 815 So. 2d 1183, 1186 (¶11) (Miss. 2002). "Filing a notice is a simple act, and a party must do all it could reasonably be expected to do to perfect the appeal in a timely fashion." *Byrd v. Biloxi Reg'l Med. Ctr.*, 722 So. 2d 166, 169 (¶13) (Miss. Ct. App. 1998).

¶18.    In his motion for an extension of time, Almasri stated that "his decision [to appeal] was based upon his own personal business analysis that was not completed until after the [thirty][-]day [filing] period . . . had expired." Further, he argued that "he at all times acted in good faith" and "his considered decision should amount to good cause . . . to grant his requested extension." Again, a motion for an extension filed after expiration of the thirty-day filing period requires a showing of excusable neglect, rather than good cause. *In re Estate of Ware*, 573 So. 2d at 775.

¶19.    From the record, it is unclear whether the chancellor granted Almasri's motion based on good cause or excusable neglect. However, even assuming the chancellor used the correct standard in making his decision, we find that Almasri did not demonstrate excusable neglect. Almasri knew the entry date of the final judgment against him, and there is no assertion that he was unaware of his deadline to file a notice of appeal. Further, Almasri offers no evidence of why he was unable to complete his business analysis within the thirty-day period following final judgment or why such would be excusable neglect. We thus find Almasri's reason for delay was within his reasonable control. And although Almasri may have acted in good faith, "[e]quity aids the vigilant and not those who slumber on their rights." *In re Estate of Winding*, 783 So. 2d 707, 711 (¶15) (Miss. 2001).

¶20.    Under Rule 4(g), the chancellor's discretion to grant Almasri's motion for an extension was limited; he only had authority to grant the motion upon a showing of excusable neglect. Almasri made no such showing to the trial court. Therefore, we hold that the chancellor abused his discretion in granting Almasri's motion to extend the time in which

9

to file a notice of appeal.

¶21.   This appeal is dismissed for lack of jurisdiction.

¶22.   **APPEAL DISMISSED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, WESTBROOKS AND TINDELL, JJ., CONCUR.**